**2026 BNH 001**     Note:   This is an unreported opinion. Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | Case No. 24-10107-KB |
| | Chapter 13 |
| Raymond J. Holman and Joshualyn V. Holman, | |
|     Debtors. | |
| | |
| Cadence Bank, | |
|     Plaintiff. | |
| v. | Adv. No. 24-1005-KB |
| Raymond J. Holman and Joshualyn V. Holman, | |
|     Defendants. | |

*William J. Amann, Esq.*
*Amann Burnett, PLLC*
*Attorney for Cadence Bank, Plaintiff*

*Gerald D. Neiman, Esq.*
*Gerald D. Neiman, Attorney at Law, PLLC*
*Attorney for Raymond J. Holman and Joshualyn V. Holman, Defendants*

## <u>MEMORANDUM OPINION</u>

**I.     INTRODUCTION**

The Court conducted a trial in this matter October 16-17, 2025 on Plaintiff Cadence Bank's complaint (ECF No. 1). Cadence Bank requests that this Court find the $350,000 debt that the Defendants guaranteed on behalf of its company non-dischargeable under 11 U.S.C. § 523(a)(2)(A), alleging that the Defendants defrauded Cadence Bank by knowingly making false representations with respect to their use of the loan proceeds. In their loan application, the Defendants represented that they intended to use the proceeds for legitimate business purposes, including remodeling a showroom and hiring additional employees. However, there is no

documentary evidence to support that any of the proceeds received from the loan were used for those purposes. Instead, a report prepared by the Defendants reflects that after the loan proceeds were wired to the business bank account, over $500,000 was transferred to the Debtor's personal checking account or used to pay personal credit card bills. Defendants testified at trial that the loan proceeds were used for their intended purpose, but given zero corroborating documentary evidence – no receipts, no invoices, no bills, no statements – this Court finds the Defendants' testimony not credible. Accordingly, this Court will enter judgment in Plaintiff's favor.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire. Venue and jurisdiction are properly with this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I).

## II. BACKGROUND

### A. The Relevant Parties and the Bankruptcy Cases

1. Cadence Bank, a Small Business Administration lender ("**Cadence Bank**" or "**Plaintiff**"), has a principal place of business at 235 Peachtree Street, NE, Suite 1900, Atlanta, GA 30303. Compl. ¶ 1.

2. Raymond J. Holman and Joshualyn V. Holman (collectively, the "**Debtors**" or the "**Defendants**") are individuals who reside at 88 Old Milford Road, Brookline, NH 03033. Ans. ¶ 2.

3. The Defendants each own 50% of Novi-Antik Design LLC ("**Novi Antik**"). ECF No. 1 at 12 in Case No. 24-10080; Pl. Ex. 1 at 2.

4. Novi-Antik filed a voluntary Chapter 7 bankruptcy petition on February 6, 2024 commencing Case No. 24-10080-BAH (the "**Novi Antik Bankruptcy Case**"). Ans. ¶ 2–3.

2

5. Prior to filing for bankruptcy, Novi Antik was a residential kitchen and bath remodeling business. Trial Tr. 50:1–8.

6. On February 22, 2024 (the "**Petition Date**"), the Defendants filed a voluntary petition under Chapter 13 of the Bankruptcy Code commencing Case No. 24-10107.

7. The Defendants filed their Schedules, Statement of Financial Affairs and other required documents on March 19, 2024 (collectively, the "**Schedules**"). ECF No. 16.

8. In their Schedules, the Defendants stated that for calendar year 2023, Mr. Holman earned gross income of $141,827, and Mrs. Holman earned gross income of $0.00, and that for calendar year 2022, Mr. Holman earned gross income of $126,276 and Mrs. Holman earned gross income of $0.00. ECF No. 16 at p. 2.

9. For the period from January 1, 2024 to the Petition Date, the Defendants stated that Mr. Holman earned gross income of $6,115 and Mrs. Holman earned gross income of $0.00. ECF No. 16 at 1.

B. **The Adversary Proceeding**

10. On June 21, 2024, Cadence Bank filed a complaint against the Defendants commencing this adversary proceeding (the "**Complaint**").

11. The Complaint included four counts against the Defendants, but only Count I (False Pretenses, False Presentation, Fraud under 11 U.S.C. § 523(a)(2)(A)) remains as the others were voluntarily dismissed by the Plaintiff. ECF No. 83 at 2.

12. Following the trial in this case, the Plaintiff and Defendants submitted post-trial briefs. *See* ECF Nos. 83 & 84.

### C. The Cadence Loan

13. On March 28, 2022, the Defendants, on behalf of Novi-Antik, applied to Cadence Bank for a small business administration loan. ECF No. 68 at 2.

14. On the Borrower Information Form, Mr. Holman stated that the purpose of the loan was for "working capital, expansion." Pl. Ex. 1. Mr. Holman further represented that "[a]ll SBA loan proceeds will be used only for business related purposes as specified in the loan application." *Id.* at 5.

15. In connection with the loan application, Mr. Holman certified that the information provided in the application and the information that he provided in all supporting documentation and forms was true and correct. Pl. Ex. 1.

16. On April 13, 2022, Cadence Bank loaned Novi Antik $350,000 (the "**Cadence Loan**"). In connection with the Cadence Loan, $350,000 was transferred from Cadence Bank to Novi Antik's business checking account (the "**Novi Antik Account**"). Trial Tr. 52:8–24.

17. The Defendants each signed personal guarantees in connection with the Cadence Loan. Ans. ¶ 11.

18. In connection with the Cadence Loan, Mr. Holman executed a "Use of Proceeds Explanation" which required that he "provide details and the dollar amount of what you would like to use the SBA loan toward" (the "**Use of Proceeds Explanation**"). Def. Ex. 1 at 1.

19. The Use Proceeds Explanation, detailed in relevant part below, reflected how Novi Antik intended to use the proceeds from the Cadence Loan:

| | |
|---|---|
| **Supplies/Inventory** $0.00 | |
| **Equipment Purchase** $75,000 | Dump Trailer – model: Big Tex $15,000.00 |

|  | Working Van – model: Mercedes 1500 Sprinter Cargo Van $55,000 Accessories for working van…. $5,000 |
|---|---|
| **Debt Refinancing** $0.00 |  |
| **Marketing** $0.00 |  |
| **Hiring** $100,00 | Two Employees: First employee – lead carpenter.. second employee – carpenter that helps the lead carpenter… |
| **Other** $175,000 | "We are expanding our showroom and will be putting in two working kitchens, a full bathroom and design center. The loan will cover all of the cabinetry, countertops, plumbing supplies, appliances, flooring, framing, drywall, painters, electrician, plumbers, light fixtures, etc." |
| **Total Loan Amount: $350,000** |  |

**(i)    Equipment Purchase**

20.    On August 6, 2022, the Defendants, on behalf of Novi Antik, purchased a 2022 Mercedez-Benz Sprinter Cargo Van, but obtained a loan to do so, in the amount of approximately $61,000 (according to Mr. Holman) (the "**Sprinter Van**"). Trial Tr. 58:3–10.

21.    In February 2024, Huntington National Bank filed a motion for relief from the automatic stay imposed in Novi Antik's bankruptcy case to retrieve the Sprinter Van based on non-payment (the "**Motion for Relief**"). *See* Novi Antik Bankruptcy Case ECF No. 35.

22.    Based on the Motion for Relief, Novi Antik borrowed $72,310.32 from Huntington National Bank to finance the Sprinter Van, and as of February 22, 2024, it owed $46,936.22 in connection with that loan. *Id.*

23. Mr. Holman testified that the Defendants paid the debt service payments on the Sprinter Van with the proceeds from the Cadence Loan, which totaled approximately $800 per month. Trial Tr. 59:5–23; 127:21–25; 128:1–5.

24. The Defendants did not provide any documentary evidence to support the testimony that any Sprinter Van debt service payments were paid with the proceeds from the Cadence Loan.

25. The Defendants did not purchase the Sprinter Van with the funds from Cadence Bank. *See* Novi Antik Bankruptcy Case ECF No. 35.

26. Mrs. Holman testified that the Defendants purchased a dump trailer for approximately $12,000, however, no documentary evidence was submitted to reflect that any proceeds from the Cadence Loan were used to purchase a dump trailer. Trial Tr. 177:16–21.

**(ii)    Hiring**

27. According to the Use of Proceeds Explanation, with the proceeds from the Cadence Loan, the Defendants intended to hire two additional employees for Novi Antik. Trial Tr. 113:1–14.

28. Mr. Holman testified that he hired two employees. *Id.* 129:10–15.

29. No evidence was submitted to reflect how much either of the new employees were paid or whether they were paid with any of the proceeds from the Cadence Loan. Specifically, the record is void of any specific information regarding the hiring of any new employees – no employee names, dates of employment, wage information, etc.

**(iii)    The Showroom Expansion**

30. The Defendants requested the Cadence Loan to grow their business and to expand the showroom. Trial Tr. 52:25–53:19. Specifically, the Defendants rented 2,500 square feet of

empty space and framed walls, installed a working kitchen, a working bar, sports bar, dining room area, full master bathroom area and a working half-bathroom for customers. *Id*. 53:20–54:9.

31. According to Mr. Holman, during the 21 months that it took the Defendants to complete the showroom expansion, he spent approximately $190,000 in materials that included buying flooring, cabinets, fixtures and décor. *Id.* 56:4–11.

32. The Defendants submitted evidence of the showroom expansion project, which included photographs depicting a largely completed showroom. *Id.* 117:7–20.

33. Defendants' Exhibits 4(a)-4(c)(1) included pictures the showroom remodel in-process – including framing and many cardboard boxes. Defendants' Exhibits 4(c)(2)-4(e) reflected pictures of a completed ceiling and flooring, as well as various cabinet hardware displays. Defendants' Exhibits 4(f)-4(m) included pictures of a fully furnished and completed showroom with multiple kitchen islands topped with stone countertops, including one large island displaying a waterfall countertop. These pictures included décor, appliances and fully installed kitchen cabinets.

34. Based on Novi Antik's bankruptcy schedules, as illustrated below, the Defendants represented that the liquidation value of the items in the showroom totaled $5,500 on February 6, 2024.

| 50. | Other machinery, fixtures, and equipment (excluding farm machinery and equipment) misc. cabinetry and fixtures (installed in showroom), appliances & lighting. Fair market valuation of approximately $5,500.00; zero value after cost of labor to remove. | $0.00 | Liquidation | $5,500.00 |

ECF No. 1 at p. 17 in Novi Antik's Bankruptcy Case.

35. Mr. Holman testified that he used a "good portion" of the proceeds as intended when he expanded and outfitted the showroom. Trial Tr. 117:17–20; 139:2–13.

7

36. When questioned about the items in the showroom, Mr. Holman testified that he did not know the worth of the countertops, yet Mr. Holman testified that he was the estimator, designer and worker for Novi Antik. *Id.* 69:15–20; 138:11–19.

37. The photographs submitted by the Defendants reflected countertops and walnut cabinets, which Mr. Holman testified were "extremely expensive." *Id.* 138:20–139:4.

38. No documentary evidence was submitted to demonstrate what the Defendants spent on the countertops, cabinets or other items identified in the showroom pictures or how the Defendants paid for any of the items in the photographs. *Id.* 140:1–141:7.

39. In terms of value, Mr. Holman testified that hardware displays may be worth $1,800, however, no documentation was provided to support this value or how they were purchased. *Id.*

### D. The Transaction Report

40. The Defendants prepared a Report for Transaction Transfer to Personal Accounts dated April 1, 2022 to December 31, 2022 (the "**Transaction Report**"). Pl. Ex. 4; Trial Tr. 151:16–152:9.

41. Based on the Transaction Report, from April 1, 2022 to December 27, 2022, the Defendants transferred $41,013.99 from the Novi-Antik Account to pay the Defendants consumer credit cards. Pl. Ex. 4; Trial Tr. 153:3-156:2.

42. Additionally, based on the Transaction Report:

   a. From April 5, 2022 to December 27, 2022, the Defendants transferred $203,000 from the Novi-Antik Account to their personal bank account;

   b. From February 9, 2023 to October 3, 2023, the Defendants transferred $36,327.35 from the Novi-Antik Account to pay the Defendants consumer credit cards;

    c.    From January 13, 2023 to January 26, 2024, the Defendants transferred $236,000 from the Novi-Antik Account to their personal bank account;

Pl. Ex. 4; Trial Tr. 165:17–170:7.

43.    Plaintiff's Exhibit 4 reflects that from April 1, 2022 to January 26, 2024, the Defendants transferred $516,341.34 from the Novi-Antik Account, of which $77,341.34 was used to pay their personal credit card bills and $439,000 was deposited into their personal checking account. Pl. Ex. 4.

44.    Mrs. Holman testified that on January 13, 2022, she incurred a credit card charge of $14,420 for a personal expense owed to Absolute Mechanical, which was an item paid for with the proceeds from the Cadence Loan. Trial Tr. 153:16–24; Pl. Ex. 7.

45.    Mrs. Holman testified that on her personal Discover credit card, she made the following purchases (collectively, the "**Luxury Purchases**"):

    a.    $20,000 to Barmakian Jewelers on 5/5/2022 for diamond rings (Trial Tr. 154:9–155:10; Pl. Ex. 7);

    b.    $945 to Hermes Boston on 10/15/2022 (Pl. Ex. 7);

    c.    $500 to Barmakian Jewelers on 9/27/2022 (Pl. Ex. 7);

    d.    $4,366.57 to Louis Vuitton Boston for a "couple of handbags" on 11/16/2022 (Trial Tr. 10–16; Pl. Ex. 7);

    e.    $1,000 to Barmakian Jewelers on 11/15/22 for a piece of jewelry (Trial Tr. 7–11; Pl. Ex. 7);

    f.    $240.06 to Chanel for an "accessory" on 5/28/2023 (Trial Tr. 12–22; Pl. Ex. 7);

    g.    $800.00 to Van Cleef and Arpels for a "piece of jewelry" on 5/28/2023 (Trial Tr. 12–22; Pl. Ex. 7);

    h. $477.87 to Gucci on 6/25/2023 (Pl. Ex. 7);

    i. $1,125 to Chanel on 6/26/2023 (Pl. Ex. 7);

    j. $1,495 to Gucci on 7/12023 for "accessories" (Trial Tr. 11-21; Pl. Ex. 7);

    k. $1,850 to Louis Vuitton on 7/29/2023 (Trial Tr. 161:2–7; Pl. Ex. 8b); and

    l. $4,848.07 to jewelers in 8/2023 (Pl. Ex. 8b).

46. In the first few weeks of receiving the proceeds from the Cadence Loan, Mrs. Holman testified that the Defendants paid themselves $45,000 by paying their personal credit card bills, which included the Luxury Purchases. Trial Tr. 168:21–25.

## III. LEGAL STANDARD

47. Section 523(a)(2)(A) provides that debts "for money" that were "obtained by— false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition" are not dischargeable. To prevail under 11 U.S.C. § 523(a)(2)(A), "a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage." *In re Spigel*, 260 F.3d 27, 32 (1st Cir. 2001) (citation modified). The creditor must prove these elements "by a preponderance of the evidence". *In re Stewart*, 948 F.3d 509, 520 (1st Cir. 2020) (citing *In re Goguen*, 691 F.3d 62, 66 (1st Cir. 2012)).

IV. **DISCUSSION**

   A. <u>**The Defendants Knowingly and Intentionally Represented They Would Spend the Cadence Loan Proceeds on Novi Antik's Business to Induce Cadence Bank to Approve the Cadence Loan**</u>

48.     The Court first concludes that Cadence Bank carried its burden to show the Defendants knowingly and intentionally misrepresented how they intended to use the Cadence Loan proceeds. "If funds are deemed to have been entrusted to the debtor for a specific purpose, the debtor is regarded as impliedly representing his intention to use the funds accordingly. Failure to use the funds [is] evidence of a misrepresentation of that intent under § 523(a)(2)(A)." *In re Segala*, 133 B.R. 261, 264 (Bankr. D. Mass 1991). In *Segala*, the debtor was a contractor who obtained a loan by stating that "he needed the money in order to continue the job" he was hired for. *Id.* The bankruptcy court found this statement enough for the contractor to represent that he would use the loan proceeds for his work, and that his decision to use most of the funds for other purposes was fraudulent. *Id.* And in *In re Dawson*, 507 B.R. 348 (Bankr. D. Utah 2014), a contractor prepared invoices for payment as he worked to complete a construction project. *Id.* at 355. The invoices represented either what the contractor would work on next, or what the contractor just completed. *Id.* at 355–56. The bankruptcy court found that these representations implied that the amounts invoiced either would be, or were, used to complete the work described in the invoices. *Id.* at 356. Based on that finding, the court concluded that the contractor acted fraudulently by making these representations, then using the money for other purposes. *Id.*

49.     Here, the Defendants made the following specific representations to Cadence Bank about how the Cadence Loan proceeds would be spent in the Use of Proceeds Explanation:

   a. $75,000 to buy a dump trailer and the Sprinter Van. However, the Defendants took out a separate loan with Huntington National Bank to buy the Sprinter Van, and

11

they presented no evidence to suggest that any Cadence Loan proceeds were used to buy their dump trailer, or make payments on the Sprinter Van loan. Def. Ex. 1; *see* Novi Antik Bankruptcy Case ECF No. 35

b. $100,000 to hire and employ two carpenters. Mr. Holman testified that Novi Antik hired two employees. However, the Defendants' only documentary evidence supporting this testimony consisted of two Indeed.com invoices totaling $140 for job postings. The Defendants presented no evidence regarding the names of any employees, when they were employed, or what they were paid. Def. Exs. 1, 5

c. $175,000 to expand Novi Antik's showroom. Mr. Holman testified that Novi Antik spent approximately $190,000 buying materials to expand the showroom. However, when questioned Mr. Holman was unable to testify to the value of any item in the showroom with any specificity. At best, Mr. Holman testified that certain countertops and cabinets were "extremely expensive", and that certain hardware displays might be worth $1,800. The Defendants presented no documentary evidence to substantiate Mr. Holman's valuations, nor any receipts or invoices showing these items were bought with Cadence Loan proceeds. Def. Ex. 1; Trial Tr. 56:4–11, 138:20–139:4.

Mr. Holman further represented: "<u>All SBA loan proceeds will be used only for business related purposes as specified in the loan application.</u>" Pl. Ex. 1 at 5 (emphasis in original).

50. The Transaction Report reflects otherwise. Cadence Bank funded the Cadence Loan on April 13, 2022. Trial Tr. 32: 9–12, 150:17–21. On April 29, 2022, the Defendants caused Novi Antik to make payments on their personal credit cards totaling approximately $45,000. Pl. Ex. 7; Trial Tr. 168:21–169:8. And on May 5, 2022, the Defendants spent $20,000 on diamonds

12

at a jewelry store. Pl. Ex. 7; Trial Tr. 154:9–155:6. That is, within one month of obtaining the Cadence Loan, the Defendants paid down personal debt and purchased luxury items to the tune of nearly 20% of the proceeds. The Defendants continued to spend: in 2022 alone, the Defendants transferred $203,000 from Novi Antik to their personal accounts, and purchased $26,811.57 in luxury items from stores like Hermes and Louis Vuitton. Pl. Exs. 4, 7 All told, the Transaction Report shows that, through January 26, 2024, the Defendants used Novi Antik funds to pay $77,341.34 in personal credit card bills and deposited $439,000 into their personal checking account, for a total of $516,341.34. Pl. Ex. 4.

51. The Court may "infer or imply bad faith and intent to defraud based on the totality of the circumstances when convinced by a preponderance of the evidence." *Palmacci v. Umpierrez*, 121 F.3d 781, 789 (1st Cir. 1997) (citation modified). The Transaction Report reflects that, since the Defendants obtained the Cadence Loan, they transferred from Novi Antik to themselves nearly one and a half times the value of the Cadence Loan proceeds and purchased tens of thousands of dollars' worth of jewels and other luxury items. As in *Segala* and *Dawson*, the Defendants represented to their lender how they would spend loan proceeds, then proceeded to spend most, if not all, of the proceeds on other things. And while Defendants testified that they used the Cadence Loan proceeds as described in the Use of Proceeds Explanation, they presented essentially no documentary support for their testimony, or any explanation why such documents did not exist. It is simply not credible that the Defendants spent $190,000 in materials for Novi Antik's showroom, yet have no documentary evidence showing those purchases. *See* Trial Tr. 56:4–11; *In re Aoki*, 323 B.R. 803 (B.A.P. 1st Cir. 2005) ("Questions of credibility are solely for the trier of fact") (citation omitted).

52. Accordingly, the Court accords little weight to the Defendants' uncorroborated testimony and infers from the record that: (1) the Defendants knew when they submitted the Use of Proceeds Explanation that they would in fact use the proceeds for themselves[1]; (2) the Defendants intended to deceive Cadence Bank into issuing the Cadence Loan on the false pretense of investing the proceeds in Novi Antik; and (3) the Defendants intended their false statements on the Use of Proceeds Explanation to induce Cadence Bank to issue the Cadence Loan. As such, the Court concludes that the Plaintiffs establish the first three elements of 11 U.S.C. § 523(a)(2)(A) by preponderance of the evidence.

### B.  Cadence Bank Justifiably Relied on the Defendants' Misrepresentations

53. The Court next concludes that Cadence Bank carried its burden to show it relied on the Defendants' misrepresentations, and that reliance was justifiable under the circumstances. "When determining if a plaintiff's reliance was justifiable, courts consider whether there were any red flags in the transaction that would have put the creditor on notice that further investigation was warranted." *In re Gannon*, 598 B.R. 72, 86 (Bankr. D. Mass. 2019) (citation modified). That is, the justifiable reliance standard "only requires investigation if a plaintiff knows any facts that would have made the representation false from a cursory glance or that they had discovered something that would have demonstrated the falsity of the statements." *In re Richert*, 632 B.R. 877, 900 (Bankr. M.D. Fla. 2021) (footnote omitted).

54. Deborah Ricketts, a Special Assets Officer with Cadence Bank, testified that Cadence Bank employees would have reviewed the information provided by Novi Antik and Defendants in their loan application in determining whether to approve the Cadence Loan. *See*

---

[1] Section 523(a)(2)(A) does not necessarily require that the alleged fraud occur "at the inception of a credit transaction." *Husky Int'l Elec., Inc. v. Ritz*, 587 U.S. 355, 361, 365 (2016) (emphasis omitted). But the record is sufficient for the Court to infer the Defendants had fraudulent intent at the Cadence Loan's inception.

Trial Tr. 23:12–21. Ms. Ricketts explained that, while the SBA agreed to guarantee 75% of the Cadence Loan, that guaranty is contingent on the SBA proving that the Cadence Loan proceeds "were used for the purposes intended on the loan" and that all collateral "has been liquidated or document why it wasn't liquidated." *Id.* at 26:12–28:1. Ms. Ricketts also confirmed that Cadence Bank relied upon the documents the Defendants and Novi Antik submitted for the Cadence Loan. *Id.* at 32:5–8. The Defendants presented no evidence to contradict this testimony.

55. Ms. Ricketts' testimony is sufficient for the Court to conclude that Cadence Bank relied on the Defendants' representations regarding how the Cadence Loan proceeds would be spent, and that such reliance was justifiable. Ms. Ricketts testified that Cadence Bank relied upon the Defendants' representations, while the Defendants presented no evidence to contradict her. *See In re Schoenmann*, 2025 WL 1840384, at *4 (Bankr. N.D. Cal. July 3, 2025) (finding justifiable reliance by SBA in relying on representations that applicant would use loan proceeds solely as working capital for her business). Nothing in the record, for instance, reflects that Cadence Bank had any reason to believe the Defendants would not use the Cadence Loan proceeds for Novi Antik. *See Richert*, 632 B.R. at 899–900 ("A bank does not have to test the honesty (or dishonesty) of a loan applicant if no obvious incongruity or ambiguity exists"). Rather, Cadence Bank received specific representations from the Defendants regarding how they intended to use the Cadence Loan proceeds, and accepted them in the absence of any obvious "red flags". *See In re Flores*, 535 B.R. 468, 484 (Bankr. D. Mass. 2015) (finding no reliance where the lender failed to ask any questions about the borrower's business). Accordingly, the Court concludes that Cadence Bank carried its burden to show actual and justifiable reliance by a preponderance of evidence.

### C. Cadence Bank Suffered Damages from Relying on the Defendants' Misrepresentations

56. Having concluded that the Defendants defrauded Cadence Bank by falsely representing how they would use the Cadence Loan proceeds, the Court next determines to what extent Cadence Bank suffered damages from the Defendants' misrepresentations. "The general rule is that the measure of damages recoverable for misrepresentation, whether intentional or negligent, is actual pecuniary loss." *Crowley v. Global Realty, Inc.*, 124 N.H. 814, 818 (1984) (citation modified). Where a debtor fraudulently induces a loan, actual loss is the outstanding loan balance "plus accrued and accruing interest". *In re Movshovich*, 521 B.R. 42, 61 (Bankr. D. Mass. 2014); *see Schoenmann*, 2025 WL 1840384, at *4 (concluding measure of damages for loan induced by false pretenses is outstanding principal and pre-petition interest).

57. Cadence Bank's proof of claim in the bankruptcy case asserts a claim amount of $322,123.78 against the Defendants. *See* Case No. 24-10107, Claim No. 10-3. That claim appears to include all pre-petition payments made by the Defendants and pre-petition interest. The Defendants did not contest that amount at trial. Accordingly, the Court concludes that Cadence Bank has carried its burden to show by preponderance of the evidence that it suffered $322,123.78 in damages from the Defendants' misrepresentations. The Court also awards Cadence Bank post-judgment interest at the 28 U.S.C. § 1961(a) federal rate. *See In re Keefe*, 401 B.R. 520, 526 (B.A.P. 1st Cir. 2009) ("Because postjudgment interest is mandated by federal statute, a prevailing party in a bankruptcy court action is automatically entitled to postjudgment interest regardless of whether postjudgment interest is referenced in the pleadings, a court's order or monetary judgment." (quoting *Miller v. Artistic Cleaners*, 153 F.3d 781, 785 (7th Cir. 1998))).

58. The Court does note, however, that Ms. Ricketts's testimony reflected that Cadence Bank received post-petition payments through the Debtor's Chapter 13 plan, and left

open the possibility that the SBA could still guarantee its 75% portion of the Cadence Loan Trial Tr. 24:6–27:6. The Court received no evidence regarding the status of the SBA's guaranty or the total value of the Defendants' plan payments toward the Cadence Loan. As such, the Court will require that Cadence Bank credit any payments through the Chapter 13 plan, and any funds received from the SBA's guaranty, toward its judgment against the Defendants.

## V. CONCLUSION

Because the preponderance of evidence presented in this case shows that the Defendants intentionally misrepresented how they intended to spend the Cadence Loan proceeds, and Cadence Bank relied on those representations to its detriment, the Court will order that:

1. Cadence Bank is entitled to a judgment against the Defendants in the amount of $322,123.78;

2. Cadence Bank is further entitled to a determination that its judgment against the Defendants is nondischargeable under 11 U.S.C. § 523(a)(2)(A);

3. Post-judgment interest shall accrue at the federal rate from the date the Court enters judgment; and

4. The Court shall enter a separate judgment promptly after entry of this memorandum opinion.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

Date: January 12, 2025　　　　　　　　/s/ Kimberly Bacher
　　　　　　　　　　　　　　　　　　Kimberly Bacher
　　　　　　　　　　　　　　　　　　Chief Bankruptcy Judge